## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 06-1578 RB |
| | ) | |
| ROBERT N. FORBES, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's (Robert N. Forbes, Jr.) Motion to Suppress Physical Evidence (Doc. 44), filed February 9, 2007.  A hearing on this motion was held March 5, 2007.  Having considered the submissions, arguments of counsel, testimony, and being otherwise fully advised, I rule as stated herein.

**I.      Background.**

At approximately 6:15 a.m. on April 13, 2006, Defendant entered the U.S. Customs and Border Protection (CBP) checkpoint located on U.S. Highway 70, west of Alamogordo, New Mexico.  Defendant was driving a tractor trailer, registered in his name.

CBP Agent Lance Hubert first questioned Defendant about his citizenship in the checkpoint's primary inspection area ("primary").  Defendant stated that he was a United States citizen.  During that exchange, Agent Hubert noticed that curtains, separating the truck cab's driving and sleeping areas, were closed.  When the agent asked Defendant whether he had any passengers, Defendant's "demeanor changed."  (Govt.'s Response 1.)  According to the Government, Defendant "became fidgety and began breaking eye contact."  (*Id.*)

Agent Hubert then asked Defendant to "open the curtain[s]" that were "obstructing the agent's view" of the cab's sleeping area. (*Id.*)  According to the agent, Defendant "turned his upper body to look at the curtain and paused," but then declined the agent's request. (*Id.*)  Defendant, conversely, testified that: (1) he opened the curtains to allow Agent Hubert to look into the cab; but (2) refused the agent's request to look underneath his bed, which is located in the cab's sleeping area.

In any event, the parties agree that the exchange in primary caused Agent Hubert to suspect that Defendant "may have been smuggling aliens." (Def.'s Mot. Suppress 2.)  As a result, Agent Hubert sought, and received, Defendant's consent to a canine inspection of the vehicle. At this point, the agent directed Defendant to move his truck to the CBP checkpoint's secondary inspection area ("secondary").  Defendant agreed to do so.

Once the tractor trailer was in secondary, Agent Hubert asked Defendant to exit his vehicle. Defendant stepped out of the tractor, locking the cab door behind him.  Agent Hubert went to retrieve his trained drug-detection dog, Canine Laika, from his vehicle, parked a short distance away. At this point, the parties' versions of the facts diverge markedly.

Defendant's motion states that:

Agent Hubert instructed [Defendant] to meet him at the back of the trailer. [Defendant] was met by two other United States Border Patrol Agents. A short time later, Agent Hubert and [C]anine Laika went to the back of the trailer to meet [Defendant]. Once at the back of the trailer, the Agents ordered [Defendant] to break the seal to the trailer and remove the lock from the trailer doors. [Defendant] complied with the Agents' orders.  After the doors to the trailer were opened, Agent Hubert lifted [Canine] Laika into the back of the trailer. Agent Hubert climbed into the back of the trailer and proceeded to conduct a systematic inspection of the contents of the trailer.  Upon the completion of the inspection, Agent Hubert and his dog climbed down and continued to conduct a search of the tractor-trailer.  Once Agent Hubert and Laika were near the front passenger door of the tractor, Agent Hubert noticed a change in his dog's demeanor.  When Agent Hubert and Laika got to the front driver's side door, Laika alerted to the presence of contraband.  Agent

2

Hubert and [C]anine Laika entered the tractor . . . .

(Def.'s Mot. Suppress 2 (internal numbering omitted).)

Conversely, the Government's response maintains:

Agent Hubert and Laika approached the tractor trailer from the rear end and began
the inspection by moving up from the rear of the passenger side toward the front of
the tractor trailer.  Laika began to alert somewhere around the passenger side door
of the tractor, and continued to alert as the inspection continued around the front of
the rig to the driver's side door.  Laika then indicated at the driver's side door by
using a pin-point stare.  An agent who was standing with the defendant at the time
that the indication occurred was prompted by Agent Hubert to ask the defendant for
permission to use his keys to open the driver's side door so that the dog could enter
the tractor.  Instead of giving the agent the keys, the defendant used the keys to open
the door himself.  Laika then made entry into the cab of the truck . . . .

(Govt.'s Resp. 2-3.)  The Government's pleading also states that "Agent Hubert, maintains that he

did not enter the trailer portion of the tractor trailer until after the arrest of the defendant which

resulted from a probable cause search based on a canine alert and indication." (*Id.* 8.)  According to

the Government, authorities entered "the trailer portion of the tractor trailer" only *after* Defendant's

arrest, in conducting an inventory search of the vehicle.  (*Id.* 3.)

It is undisputed that when Canine Laika entered the cab, she located, and passively alerted to,

four large bundles in the sleeping area.  A narcotics field-test indicated that the bundles contained

marijuana.  In total, the agents found 91.6 kilograms (201.94 pounds) of marijuana in the truck cab.

No contraband was discovered in the vehicle's trailer.

At the March 5, 2007 motion hearing, three of the four CBP agents who were present during

the incident in question, testified.[1]  Agent Michael Holland, Agent Hubert, and Agent Cesar Duchene

stated that no entry was made into the back of the trailer before Canine Laika alerted to the exterior

---

[1]The fourth agent, CBP Agent Michael Caldwell, did not testify.  Agent Caldwell has relocated to the San
Antonio, Texas area and, according to the Government, does not recall the underlying April 13, 2006 events.

3

of the driver's-side door.  They also agreed that the seal on Defendant's cargo load was broken and

the trailer doors were opened after Defendant's arrest.[2]  At that same time, their testimony diverged

on several key points.  For instance, while Agents Hubert, Holland, and Duchene each testified that

they saw the trailer's doors open at the checkpoint on April 13, 2006, each agent denied seeing the

trailer doors opened and denied knowing, or recalling, who unlocked or opened them.[3]

Defendant's account of the sequence of events during the canine inspection is significantly different

than either Agents Holland, Hubert, or Duchene's testimony.  Defendant testified that, after he exited

the truck cab in secondary and walked to the rear of the vehicle, Agent Hubert asked him to open the

doors to the trailer with his keys and to break the load seal.[4]  He stated that he complied with the

agent's request and, thereafter, placed the seal on the rear of the trailer.  Defendant also testified that

---

[2]At the hearing, defense counsel made much of the agents failure to place a CBP seal or letter on
Defendant's load after they completed their inspection.  This is immaterial.  The agents all testified that CBP
policy only requires a seal or letter from CBP to be placed on a trucker's load where CBP discovers no contraband
inside the vehicle after breaking the seal.  Here, clearly, agents discovered marijuana inside Defendant's tractor
and arrested him.

[3]The Court finds it disturbing that Agents Holland, Hubert, and Duchene were unable to agree on which
agents were where, when during the canine sniff.  For instance, Agent Holland testified that he stood next to
Defendant at the rear of the vehicle during the canine inspection.  On cross-examination, however, the agent
initially stated that he could not recall how many agents were standing at the back of the trailer. He later stated that
at least three agents were there.  (Defendant also testified, at several different points, that there were two, or
possibly three, agents standing at the rear of the truck with him during the canine inspection of his vehicle's
exterior).
    Conversely, Agent Duchene testified, at least three different points during defense counsel's direct
examination, that he was the only agent standing with Defendant at the back of the trailer during the canine sniff.
Agent Duchene testified that when Agent Hubert first arrived in secondary with Canine Laika there were two
agents standing with Defendant at the trailer's rear: Agent Duchene and Agent Hubert.  Agents Hubert and
Duchene testified that Agent Duchene escorted Defendant from the cab to the rear of the trailer.  Additionally,
Agent Duchene initially testified that he could not recall where Agent Holland was during this period.  But, in
response to a leading question, posed by the Assistant U.S. Attorney on cross-examination, Agent Duchene
recalled that Agents Holland, Caldwell, and Henderson were also in secondary.  The agent then stated that he
could not recall where Agents Holland and Henderson were during this period.  As explained below, however, the
Court need not resolve this factual dispute to resolve the pending motion.

[4]Defendant noted that the lock on the trailer was his, that he had the key to that lock, and that the agents
did not know which, of the many keys Defendant was carrying, opened the lock.

he neither gave the agent consent to enter the trailer, nor knew that he had the right to refuse the agent's request.

Defendant stated that Agent Hubert placed Canine Laika inside the trailer and then got in himself.  According to Defendant, the agent walked the dog up the full length of the trailer on one side, and back the other.[5]  Defendant stated that, after Agent Hubert and the dog stepped down from the trailer, he closed and relocked the trailer doors.  As noted above, authorities discovered no contraband or other physical evidence in the trailer.

The agents' and Defendant's testimony is consistent that Agent Hubert ran the dog around the exterior of the vehicle, beginning at the rear and proceeding in a counter-clockwise direction around the front of the tractor trailer.  It is undisputed that Agent Hubert announced at the driver's-side cab door that Canine Laika had alerted.

Matt Devaney, CBP Canine Training Coordinator, testified - at the February 5, 2007 pretrial motion hearing - that Canine Laika was trained and certified to passively alert to, *inter alia*, concealed marijuana.  He also testified that the pinpoint stare, as well as sitting down as close as possible to the odor detected by the dog, are recognized passive alerts.  This Court found that Agent Hubert and Canine Laika's current certification on April 13, 2006 established the canine's reliability.  (Order [Doc. 39] 5 (noting that "Devaney's detailed testimony . . . resolved any lingering concerns related to this team's reliability").)

In searching the cab following Defendant's arrest, agents found Defendant's resident alien card.  Defendant's motion suggests that, in addition to the marijuana, authorities found "cell phones,

---

[5]Agent Hubert testified that Defendant's trailer contained a load of gun safes.  Defendant testified that there was ample room inside the trailer for Agent Hubert and the dog to walk down both sides of the trailer's interior.

log books, [and] miscellaneous papers" in searching his vehicle. Defendant seeks suppression of all physical evidence derived from the April 13, 2006 incident.

## III.    Discussion.

The Fourth Amendment of the United States Constitution proscribes "unreasonable searches and seizures" by the Government. U.S. CONST. amend. IV. "It is well established that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment." *Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000). "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *Id*. at 37.

Yet, it is clear that "Border Patrol agents can briefly detain vehicles in the absence of any individualized suspicion at reasonably located permanent checkpoints." *United States v. Badilla*, 383 F.3d 1137, 1141 (10th Cir. 2004), *vacated and remanded on other grounds*, 543 U.S. 1098 (2005) (citing *United States v. Booker*, 543 U.S. 220 (2005)). Indeed, as the Court of Appeals for the Tenth Circuit has explained:

> "During a routine fixed-checkpoint stop, border patrol agents may question individuals in the absence of individualized suspicion about their citizenship and immigration status and request documentation." Furthermore, "agents may briefly question individuals concerning such things as vehicle ownership, cargo, destination, and travel plans, as long as such questions are reasonably related to the agent's duty to prevent the unauthorized entry of individuals into this country and to prevent the smuggling of contraband." Thus, the first stage of the encounter must remain brief, unintrusive, and must "not exceed the scope of a permissible routine checkpoint stop."

*United States v. Velasco*, 68 F. App'x 885, 887 (10th Cir. 2003) (quoting *United States v. Massie*, 65 F.3d 843, 847-48 (10th Cir. 1995)).

Provided it does not "add significantly to the length or intrusiveness of the detention," it is clear that "'the presence of a suspicious circumstance allows a border patrol agent'" to, *inter alia*,

ask a driver to move their vehicle to secondary.  *E.g.*, *id.* (no Fourth Amendment violation where agent directed the defendant to move vehicle to secondary) (quoting *United States v. Rascon-Ortiz*, 994 F.2d 749, 753 n.6 (10th Cir. 1993)).  In any event, "[a] canine sniff on the exterior of a vehicle during a lawful traffic stop does not," in itself, "implicate legitimate privacy interests." *United States v. Williams*, 403 F.3d 1203, 1207 (10th Cir. 2005) (citing *Illinois v. Caballes*, 543 U.S. 405, 409 (2005)); *cf. United States v. Ladeaux*, 454 F.3d 1107, 1110 n.3 (10th Cir. 2005) (recognizing that, in *Caballes*, the Supreme Court held that "the use of a dog-sniff during a lawful traffic stop is not unconstitutional where the sniff does not extend the length of the detention" (citation omitted)); *see generally Caballes*, 543 U.S. at 408-09 (because "any interest in possessing contraband cannot be deemed legitimate, and . . . governmental conduct that only reveals the possession of contraband compromises no legitimate privacy interest" (internal quotation marks and citation omitted)).

It is well-established that "'police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.'" *United States v. Stewart*, 473 F.3d 1265, 1270 (10th Cir. 2007) (quoting *California v. Acevedo*, 500 U.S. 565, 580 (1991)).  "A canine alert gives rise to probable cause to search a vehicle . . . even when the dog alert occurs during a warrantless sniff on 'the exterior of a vehicle during a lawful traffic stop.'" *Id.* (quoting *Williams*, 403 F.3d at 1207); *see also Caballes*, 543 U.S. at 409 (holding that, where a canine sniff was performed on the respondent's lawfully-detained car, "[a]ny intrusion on [his] privacy expectations d[id] not rise to the level of a constitutionally cognizable infringement")).

Here, it is undisputed that: (1) Agent Hubert suspected that Defendant "may have been smuggling aliens" when he asked Defendant, in primary, if he would agree to a vehicle canine sniff;[6]

---

[6]Defendant does not challenge his detention in primary by Agent Hubert.

(2) Defendant agreed to the canine sniff and, also, to move his tractor trailer to secondary.[7]  It is also

uncontested that the canine inspection of the tractor trailer's exterior: (1) started at the rear of the

vehicle and proceeded, on the passenger's-side, counter-clockwise; and (2) resulted in Canine Laika

"alert[ing] to the presence of contraband" when "Agent Hubert and Laika got to the front driver's

side door."  (Def.'s Mot. Suppress 2.)

The Court is presented, therefore, with a single dispute of material fact: whether CBP agents

searched the trailer of Defendant's vehicle before or after Canine Laika alerted to the exterior

driver's-side tractor door.  As noted above, Defendant maintains that authorities unsealed his cargo

load and entered the trailer with Canine Laika *prior* to the alert.  Defendant argues that - absent a

warrant, Defendant's consent, or probable cause - authorities' trailer search "exceed[ed] the scope

and duration of [Defendant's] consent" to the canine sniff.[8]  *See United States v. Rosborough*, 366

F.3d 1145, 1150 (10th Cir. 2004) (investigatory *Terry v. Ohio*, 392 U.S. 1 (1968), stop).  The

Government asserts that CBP agents did not search Defendant's cargo load until *after* the canine

alerted.

The Court need not - and will not - make the credibility determinations necessary to resolve

this issue.

Even if CBP agents searched Defendant's trailer before Canine Laika alerted in violation of

---

[7]For the reasons recounted above, the agents did not need Defendant's consent to lawfully conduct a
canine inspection of the vehicle's exterior.  *See Stewart*, 473 F.3d at 1270; *Williams*, 403 F.3d at 1207.

[8]Defendant denies that he consented to the alleged search of the trailer prior to the canine alert.  Whether
Defendant "freely and voluntarily consented to the search of the vehicle is a question of fact based on the totality of
the circumstances."  *United States v. Rosborough*, 366 F.3d 1145, 1149 (10th Cir. 2004) (determination requires
the court to assess "whether the officer's conduct constituted a coercive show of authority, such that a reasonable
person would believe he was not free to "decline the officer's requests or otherwise terminate the encounter."  *Id.*
(internal quotation marks and citation omitted)).

8

Defendant's Fourth Amendment rights, the physical evidence derived therefrom is admissible.  That

is, assuming *arguendo* that the CBP agents' conduct "did violate his Fourth Amendment rights," the

evidence Defendant seeks to suppress is not 'fruit of the poisonous tree.'"  *United States v. Nava-*

*Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000) (internal quotation marks and citation omitted).

The Tenth Circuit has "'identified several circumstances in which evidence obtained following

a Fourth Amendment violation is not subject to suppression.'"  *United States v. Macias*, No.

99-4046, 1999 WL 1244469, at *3 (10th Cir. Dec. 17, 1999) (table decision) (quoting *United States*

*v. Eylicio-Montoya*, 70 F.3d 1158 (10th Cir. 1995)).  This includes "situations where 'illegally seized

evidence . . . was also *lawfully* obtained through an independent source.'"  *Id.* (emphasis added).  In

its touchstone *Nix v. Williams* decision, the Supreme Court explained that:

> The core rationale consistently advanced by this Court for extending the exclusionary
> rule to evidence that is the fruit of unlawful police conduct has been that this
> admittedly drastic and socially costly course is needed to deter police from violations
> of constitutional and statutory protections. This Court has accepted the argument that
> the way to ensure such protections is to exclude evidence seized as a result of such
> violations notwithstanding the high social cost of letting persons obviously guilty go
> unpunished for their crimes. On this rationale, the prosecution is not to be put in a
> better position than it would have been in if no illegality had transpired.
>
> By contrast, the derivative evidence analysis ensures that the prosecution is not put
> in a *worse* position simply because of some earlier police error or misconduct. The
> independent source doctrine allows admission of evidence that has been discovered
> by means wholly independent of any constitutional violation . . . . The independent
> source doctrine teaches us that the interest of society in deterring unlawful police
> conduct and the public interest in having juries receive all probative evidence of a
> crime are properly balanced by putting the police in the same, not a worse, position
> that they would have been in if no police error or misconduct had occurred.  When
> the challenged evidence has an independent source, exclusion of such evidence would
> put the police in a *worse* position than they would have been in absent any error or
> violation.

*Nix v. Williams*, 467 U.S. 431, 442-43 (1984) (second emphasis added) (citations omitted).

Put simply, in this context, the "independent source" doctrine:

permits the introduction of "evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality."  The ultimate inquiry is whether the alleged independent source is "in fact a genuinely independent source of the information and tangible evidence at issue."

*United States v. Griffin*, 48 F.3d 1147, 1150 (10th Cir. 1995) (quoting *Murray v. United States*, 487 U.S. 533, 542 (1988)).

Here, it is clear that authorities found no contraband in Defendant's trailer.  Agent Hubert would have proceeded with Canine Laika's *lawful* inspection of the vehicle's exterior, in any event. Canine Laika's alert to the exterior, driver's-side door independently furnished "probable cause to search [the] vehicle."  *See Badilla*, 383 F.3d at 1142 (canine alert furnishes probable cause to search vehicle); *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006) ("the government may avoid suppression by demonstrating that the evidence . . . was discovered by independent means"). Therefore, CBP agents' alleged search of the trailer prior to the dog alert did not "lead to," or otherwise taint, the ultimate discovery of contraband in Defendant's vehicle.  *Cf. Nix*, 467 U.S. at 443 (independent source doctrine inapplicable where the defendant's statements - obtained in violation of his Sixth Amendment rights - "led police to the [victim's] body").

Any lingering doubt regarding the "independent source" doctrine's applicability is quickly dispelled when focusing on the "independent source" at issue in the instant matter.  Quite obviously, Canine Laika - and, thus, her alert to the odor of marijuana - would have been wholly unaffected by the sequence of events proffered by Defendant during the canine inspection.  *See United States v. Harris*, No. 98-4482, 1999 WL 133134, at *2 (4th Cir. Mar. 12, 1999) (per curiam) (table decision) (positive canine alert constituted "independent source") ("canine sniff provided the requisite probable

cause to obtain the search warrant and was an independent source from the assumed illegal seizure of the vehicle"); *United States v. Tucker*, No. 3:06-cr-92-J-33MCR, 2006 WL 1540383, at *6 (M.D. Fla. June 5, 2006) (same) ("even if [the officer's] search could be considered unlawful by a reviewing court, the canine sniff provided probable cause for the search and seizure of the contraband independent of [the officer's] activities."). *Compare United States v. Buchanon*, 72 F.3d 1217, 1226 (6th Cir. 1995) (canine sniff not an "independent source" where the "sniff [wa]s performed *as the result of* the exploitation of a primary illegality" - an unlawful *Terry* stop - and, thus, finding that "the fruits of that canine sniff must be suppressed" (emphasis added)), *with supra* notes 6-7 and accompanying text (Defendant is not contesting his detention CBP in primary, nor does he dispute that he agreed to move his vehicle to secondary).

The physical evidence recovered from Defendant's tractor is admissible: it was discovered through means independent of any unconstitutional conduct on the agents' part.[9] Hence, this Court cannot suppress the evidence as the fruit of the allegedly unlawful search of Defendant's trailer. *See Murray*, 487 U.S. at 537 (independent source doctrine applicable to evidence "initially discovered during . . . an unlawful search, but later obtained independently from activities untainted by the initial illegality").

---

[9]The Court acknowledges that neither party briefed, or otherwise addressed, the "independent source" doctrine's applicability to this case. No matter. As explained above, it is undisputed that Canine Laika alerted to the driver's-side door. The legal determination presented is, therefore, clear cut: the dog provided an "independent source" for the agent's recovery of the contraband. Further, to the extent Defendant seeks suppression based on his *detention* (i.e., the purportedly unlawful expanded scope thereof effected by the alleged pre-arrest search of the trailer), it is evident that he cannot make the requisite showing that "'a factual nexus [exists] between the illegality and the challenged evidence.'" *Cf., e.g., Ladeaux*, 454 F.3d at 1111-12 (quoting, and recognizing the viability of the - admittedly controversial holding of, *United States v. Nava-Ramirez*, 210 F.3d 1128 (10th Cir. 2000), and its burden-shifting analysis, which applies where defendants seek suppression of evidence stemming from an allegedly unconstitutional *detention*). Defendant cannot show - in light of Canine Laika's alert to the driver's-side door - that the contraband "would never have been found *but for* his . . . [purportedly] unlawful detention." *See id.* (emphasis added) (internal quotation marks and citation omitted).

**IV.    Conclusion.**

For the forgoing reasons, Defendant's Motion to Suppress Physical Evidence (Doc. 44), is

**denied**.

**IT IS SO ORDERED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**